UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| BIN LU,<br><br>           Plaintiff,<br><br>    v.<br><br>ENIGMA MPC, INC., et al.,<br><br>           Defendants. | Case No. 23-cv-02152-LB<br><br>**ORDER GRANTING MOTION TO DISMISS**<br><br>Re: ECF No. 19 |

## INTRODUCTION

Defendants Can Kisagun and Guy Zyskind founded a company called Enigma (also a defendant) to develop two products for sharing and analyzing encrypted data. They funded the development with an initial coin offering (ICO) of a cryptocurrency called ENG tokens. Plaintiff Bin Lu, a Singapore resident, bought 280,000 ENG tokens for $1.4 million on Binance, a secondary market for digital-currency exchanges. Three years after the ICO, the SEC ordered that it violated the Securities Act of 1933 because it was a sale of unregistered securities. The plaintiff alleges that the defendants replaced Enigma with a new project called the Secret Network (created by their new company SCRT Labs) and allowed buyers of ENG tokens to swap their tokens for a new cryptocurrency called Secret tokens. The plaintiff did not know about this opportunity. The

swap rendered his ENG tokens worthless. He claims that this was conversion and a violation of California's Consumer Legal Remedies Act (CLRA).[1]

Enigma and Mr. Kisagun moved to dismiss the complaint under Federal Rules of Civil Procedure 9(b) and 12(b)(6), mainly on the grounds that (1) the CLRA does not apply to sales of cryptocurrencies or to events occurring after a transaction and (2) there was no conversion because the defendants never exercised dominion over the plaintiff's ENG tokens.[2] The court grants the motion.

## STATEMENT

### 1. Factual Background

The plaintiff resides in Singapore.[3] The defendants are Enigma (a corporation with a principal place of business in San Francisco), Mr. Zyskind (Enigma's Chief Executive Officer, Chief Technology Officer, President, and Director), and Mr. Kisagun (Enigma's Chief Product Officer).[4] Messieurs Zyskind and Kisagun founded Enigma in 2015 "with an initial focus [on] developing technologies dedicated to securely sharing and analyzing encrypted data."[5] In 2017, they published whitepapers on the Enigma Protocol, "a privacy-focused, decentralized computation platform," and Catalyst, "a cryptocurrency investment platform to be deployed on the Enigma Protocol."[6]

To raise funds for the Enigma Protocol and Catalyst, the defendants conducted an ICO from June 2017 through September 11, 2017 for a "proprietary digital currency," ENG tokens.[7] During this period, they promoted the ICO on Enigma's website and social-media channels. They "boasted Enigma's founders' and advisors' connections to institutions such as the MIT Media Lab in an

---

[1] Compl. – ECF No. 1. Citations refer to material in the Electronic Case File (ECF); pinpoint citations are to the ECF-generated page numbers at the top of documents and sometimes also to the page numbers at the bottom right of SEC filings.

[2] Mot. – ECF No. 19; Joinder – ECF No. 26.

[3] Compl. – ECF No. 1 at 2 (¶ 6).

[4] Id. at 2 (¶¶ 7–9), 3 (¶¶ 11–12).

[5] Id. at 3 (¶ 10).

[6] Id. (¶ 13).

[7] Id. (¶¶ 14, 18).

effort to generate interest and participation." They paid third parties in ENG tokens to promote the ICO in a "so-called 'bounty campaign'" to "create the appearance" that ENG tokens were a good investment. The defendants raised "approximately $45 million [during the ICO] through the sale of approximately 75 million ENG [t]okens to nearly 6,000 people."[8]

The ICO buyers sold ENG tokens on the secondary market through digital-currency exchanges such as Binance. In September 2017, the plaintiff purchased "approximately 280,000" ENG tokens on Binance for "approximately $1.4 million."[9]

After the ICO, the SEC "instituted cease-and-desist proceedings against Enigma pursuant to Section 8 of the Securities Act of 1933."[10] In February 2020, the SEC found that through the ICO, Enigma had offered to sell and sold unregistered securities, in violation of the '33 Act. The SEC ordered Enigma to pay a $500,000 civil penalty and reimburse those who purchased ENG tokens and submitted claims to Enigma "within a given time period."[11]

Mr. Zyskind and Mr. Kisagun then allegedly "abandoned Enigma in favor of the Secret Network, a cryptocurrency project that Enigma characterized as 'the successor of the Enigma Protocol.'"[12] "[M]any of the same individuals who were involved with Enigma are now involved in some capacity with the Secret Network."[13] Mr. Zyskind is the Chief Executive Officer and Founder of Gamma Research and Development Ltd. d/b/a SCRT Labs, which "characterizes itself as 'the driving force and the founding core development team behind Secret Network.'"[14] Enigma's online presence has been rebranded "under the guise of the Secret Network."[15]

From February 2020 until early 2021, the Secret Network allegedly allowed ENG token holders to exchange those tokens for "Secret" tokens, which the plaintiff characterizes as the "Secret

---

[8] *Id.* (¶¶ 15–19).
[9] *Id.* at 4 (¶¶ 20–21).
[10] *Id.* (¶ 22).
[11] *Id.* (¶¶ 23–24).
[12] *Id.* (¶ 25).
[13] *Id.* (¶ 27).
[14] *Id.* at 4–5 (¶ 28).
[15] *Id.* at 5 (¶ 35).

ORDER – No. 23-cv-02152-LB                    3

Swap." The defendants "never publicly announced the Secret Swap or otherwise informed ENG [t]oken holders of the Secret Swap." The plaintiff did not receive notice of the swap opportunity.[16]

After the defendants "abandoned" Enigma because of the SEC cease-and-desist action, there was no longer an active market for ENG tokens, which rendered the tokens valueless.[17]

The defendants provide more context about the transition to the Secret Network, citing Enigma's SEC filings (accessible on EDGAR, the SEC's online database) and the SEC's cease-and-desist order about the '33 Act violations.[18] The SEC's order required Enigma to link to the order in a press release on its website and file a Form 10 to register the ENG tokens as a class of securities.[19] In its initial Form 10 filed on September 18, 2020, Enigma discussed the "Secret Network," described it as "the successor of the Enigma Protocol," and identified Secret's "SCRT" cryptocurrency coins.[20] It also disclosed the ENG-SCRT swap: "***Holders of SCRT coins have voted to enable the Secret Network to generate additional SCRT coins to be granted to holders of ENG Tokens in exchange for burning such tokens, or the Community Swap.***"[21] Between September 2020 and January 2021, Enigma referenced the swap in ten more public filings on its EDGAR page and in an announcement on Binance.[22] The plaintiff owns his tokens still.[23]

---

[16] *Id.* (¶¶ 30–33).

[17] *Id.* (¶¶ 34, 36).

[18] The court considers these documents, which are either incorporated by reference in the complaint or public records that can be judicially noticed. Fed. R. Evid. 201(b); *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001); *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (incorporation-by-reference doctrine). The plaintiff did not oppose the defendants' request for judicial notice.

[19] SEC Order, Ex. A to Patchen Decl. – ECF No 20-2 at 6.

[20] *See, e.g.*, Form 10, Ex. B to Patchen Decl. – ECF No. 20-3 at 6 (p. 5/77), 8 (p. 7/77).

[21] *Id.* at 26 (p. 25/77).

[22] 9/25/2020 Binance Announcement, Ex. C to Patchen Decl. – ECF No. 20-4 at 2–3; SEC Filings, Exs. D–M to Patchen Decl. – ECF Nos. 20-5 to 20-14.

[23] Mot. – ECF No. 19 at 12; Opp'n – ECF No. 29 (does not dispute this); *see* Compl. – ECF No. 1 at 7 (¶¶ 50–51) (before filing suit, the plaintiff demanded that the defendants "correct, repair, replace, or otherwise rectify the goods or services alleged to be in violation of [the CLRA]").

**2. Procedural History**

The complaint has two claims: (1) a violation of the CLRA, Cal. Civ. Code § 1770(a)(10) ("[a]dvertising goods or services with intent not to supply reasonably expectable demand, unless the advertisement discloses a limitation of quantity"), and (2) conversion (the defendants "wrongfully interfered with [the plaintiff]'s lawful right to possess the [ENG tokens] by deliberately destroying their value by abandoning Enigma").[24] The court has diversity jurisdiction. 28 U.S.C. § 1332. All parties (including the non-appearing defendant Mr. Zyskind, who has not yet been served) consented to magistrate-judge jurisdiction.[25] *Id.* § 636(c). Enigma and Mr. Kisagun moved to dismiss the complaint.[26] The court held a hearing on November 30, 2023.

**STANDARD OF REVIEW**

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief" to give the defendant "fair notice" of (1) what the claims are and (2) the grounds upon which they rest. Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, "[a] complaint may fail to show a right to relief either by lacking a cognizable legal theory or by lacking sufficient facts alleged under a cognizable legal theory." *Woods v. U.S. Bank N.A.*, 831 F.3d 1159, 1162 (9th Cir. 2016).

A complaint does not need detailed factual allegations, but "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (cleaned up). A complaint must contain factual allegations that, when accepted as true, are sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *NorthBay Healthcare Grp., Inc. v. Kaiser Found. Health Plan, Inc.*, 838 F. App'x 231, 234 (9th

---

[24] Compl. – ECF No. 1 at 6–8 (¶¶ 42–62).
[25] Consents – ECF Nos. 10, 17, 23, 27.
[26] Mot. – ECF No. 19; Joinder – ECF No. 26.

Cir. 2020). "[O]nly the *claim* needs to be plausible, and not the facts themselves. . . ." *NorthBay*, 838 F. App'x at 234 (citing *Iqbal*, 556 U.S. at 696); *see Interpipe Contracting, Inc. v. Becerra*, 898 F.3d 879, 886–87 (9th Cir. 2018) (the court must accept the factual allegations in the complaint "as true and construe them in the light most favorable to the plaintiff") (cleaned up).

Put another way, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (cleaned up).

Fraud allegations elicit a more demanding standard. "In alleging fraud . . . , a party must state with particularity the circumstances constituting fraud. . . . Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). This means that "[a]verments of fraud must be accompanied by the 'who, what, when, where, and how' of the misconduct charged." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003). "The plaintiff must [also] set forth what is false or misleading about a statement, and why it is false." *Id.* (cleaned up). Like the basic "notice pleading" demands of Rule 8, a driving concern behind Rule 9(b) is that defendants be given fair notice of the charges against them. *In re Lui*, 646 F. App'x 571, 573 (9th Cir. 2016) ("Rule 9(b) demands that allegations of fraud be specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong.") (cleaned up); *Odom v. Microsoft Corp.*, 486 F.3d 541, 553 (9th Cir. 2007) (Rule 9(b) requires particularity "so that the defendant can prepare an adequate answer").

If a court dismisses a complaint because of insufficient factual allegations, it should give leave to amend unless "the pleading could not possibly be cured by the allegation of other facts." *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990). If a court dismisses a complaint because its legal theory is not cognizable, the court should not give leave to amend. *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1184 (9th Cir. 2016); *see*

*Steele-Klein v. Int'l Bhd. of Teamsters, Loc. 117*, 696 F. App'x 200, 202 (9th Cir. 2017) (leave to amend may be appropriate if the plaintiff "identifie[s] how she would articulate a cognizable legal theory if given the opportunity").

## ANALYSIS

**1. CLRA**

The court grants the motion to dismiss the CLRA claim because the CLRA does not apply.

The CLRA makes "unlawful" certain "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770(a). "Goods" are defined as "tangible chattels bought or leased for use primarily for personal, family, or household purposes." *Id.* § 1761(a). "Services" are "work, labor, and services for other than a commercial or business use, including services furnished in connection with the sale or repair of goods." *Id.* § 1761(b).

The main issue is whether the CLRA applies to the ENG tokens. The defendants contend that the CLRA, which applies to services and tangible goods, does not apply to digital currencies like ENG tokens that are intangible goods, even if some "ancillary services" are provided too.[27] Citing Enigma's Form 10, the plaintiff counters that the tokens were used to participate in the Enigma protocol (for example, by paying transaction fees), and thus "amount to a transaction for a service rather than an intangible good."[28] The parties therefore do not dispute that the intangible ENG tokens are not goods under the CLRA. *Fairbanks v. Super. Ct.*, 46 Cal. 4th 56, 65 (2009) ("investment securities" are "intangible goods" for purposes of the CLRA); *Smith v. Ygrene Energy Fund, Inc.*, No. 17-cv-01258-LB, 2017 WL 3168519, at *8 (N.D. Cal. July 26, 2017) ("The California Supreme Court, and federal courts in California, have held that the CLRA does

---

[27] Mot. – ECF No. 19 at 14–16.

[28] Opp'n – ECF No. 29 at 14 (citing Form 10, Ex. B to Patchen Decl. – ECF No. 20-3 at 16 (p. 15/77)), 12–15. This is a new theory (as discussed below): the plaintiff alleged only that the defendants' abandonment of Enigma eliminated the market for the purchase and sale of the tokens, rendering his investment worthless. Compl. – ECF No. 1 at 5 (¶¶ 34, 38). That said, the court considers the Form 10 admission, which is relevant at least to whether an amended complaint containing the allegation would state a claim.

ORDER – No. 23-cv-02152-LB            7

not apply to intangible financial products" such as loans); *Suski v. Marden-Kane, Inc.*, No. 21-cv-04539-SK, 2022 WL 3974259, at *7 (N.D. Cal. Aug. 31, 2022) ("The parties agree that Dogecoin is cryptocurrency and thus is an intangible good outside the purview of the CLRA."); *Jeong v. Nexo Fin. LLC*, No. 21-cv-02392-BLF, 2022 WL 174236, at *23 (N.D. Cal. Jan. 19, 2022) ("[J]ust as with an extension of credit, the underlying 'good' in a cryptocurrency exchange is not a 'tangible chattel.'"). Instead, they dispute whether the services associated with Enigma tokens render the tokens subject to the CLRA when ordinarily, they would be intangible financial products not subject to the CLRA.

The plaintiff's allegations are about unfair practices that affected an investment into an intangible financial good, rendering it worthless. The SEC determined that the ENG tokens are securities.[29] The plaintiff bought his tokens as an investment because he "had reason to believe that the value of ENG [t]okens would increase over time."[30] The tokens lost value, allegedly because the defendants abandoned Enigma and thereby eliminated the secondary market for the purchase or sale of ENG tokens. That rendered the tokens (the plaintiff's investment) nearly worthless.[31] These are allegations about an intangible good, not a service. Thus, for the claim that the plaintiff pleaded, based on the cases cited in the previous paragraph, the Enigma cryptocurrency is an intangible good (and only an intangible good) that is not subject to the CLRA.

In his opposition, the plaintiff cites Enigma's statements in its Form 10 that, he asserts, establish that the ENG tokens were tethered to a service: the Enigma Protocol was a "decentralized network for privacy-preserving computations" in which "ENG tokens were meant to be used by their holders to participate in the [Enigma] protocol by paying transaction fees (without which, no transaction can be executed on the blockchain), to take and run nodes to secure the network, to receive network incentives and fees[,] and to reward nodes for successful contribution to the network."[32] The

---

[29] Compl. – ECF No. 1 at 4 (¶¶ 23–24).

[30] *Id.* at 6 (¶ 47).

[31] *Id.* at 5 (¶¶ 34, 38).

[32] Opp'n – ECF No. 29 at 14 (citing Form 10, Ex. B to Patchen Decl. – ECF No. 20-3 at 16 (p. 15/77)).

plaintiff asserts that because the tokens' utility was participation in the protocol, they "amount to a transaction for a service rather than an intangible good."[33]

To support this argument, he analogizes to cases that have held — in the gaming context — that in-game transactions in digital currency are services subject to the CLRA because the users buy the in-game currency to participate in the online game, which is an entertainment service. Courts are split on the issue. *Ochoa v. Zeroo Gravity Games LLC*, No. CV 22-5896-GW-ASx, 2023 WL 4291650, at *13 (C.D. Cal. May 24, 2023) (recognizing split). In *Doe v. Roblox Corp.*, for example, the court held that a virtual currency in a video game is a CLRA "service" because when players use real money to buy in-game money, that transaction is "to make use of a part of" the online-entertainment service that is the video game. 602 F. Supp. 3d 1243, 1263–64 (N.D. Cal. 2022). Other cases have reached the opposite conclusion, holding that in-game money is merely "credit extended" to players, like an intangible good. *Doe v. Epic Games, Inc.*, 435 F. Supp. 3d 1024, 1045–46 (N.D. Cal. 2020) (collecting cases); *Mai v. Supercell Oy*, 648 F. Supp. 3d 1130, 1136 (N.D. Cal. 2023) ("The Court agrees with other courts in this district in holding that virtual currency is not a good or service for purposes of the CLRA.").

Conceptually, a transaction for an intangible good perhaps could fall within the CLRA's scope if the transaction is "intended to result or [did] result[]" in the sale of services to the consumer. Cal. Civ. Code § 1770(a). But here, the plaintiff invested in an intangible good that literally was a security issued by a company to raise money to fund its business. And he did so to make money if the further development of the company's service increased the tokens' value.[34] Moreover, he bought his tokens from someone other than the defendants, thus raising doubt (at least in the absence of an allegation otherwise) that his transaction was intended to result in his participation in the Enigma Protocol.

The gaming cases, on the other hand, are predicated on the conclusion that users buy digital currency with real money to play the game, the entertainment service. *Roblox*, 602 F. Supp. 3d at

---

[33] *Id.* at 12–15.

[34] Compl. – ECF No. 1 at 6 (¶¶ 46–47).

1251, 1263–64. The gaming cases thus do not change the court's earlier analysis: the tokens are an intangible good outside the CLRA's scope. An association of a potential service with cryptocurrency securities traded on a secondary market does not implicate the CLRA for claims predicated on (essentially) company acts that decrease the tokens' value on the secondary market.

A second ground for dismissing the claim is that the CLRA provision cited by the plaintiff does not apply.[35] He relies on Cal. Civ. Code § 1770(a)(10), which makes unlawful "[a]dvertising goods or services with intent not to supply reasonably expectable demand, unless the advertisement discloses a limitation of quantity." But he does not allege that the supply of ENG tokens was lacking; to the contrary, he purchased 280,000 of them.[36] *Makaeff v. Trump Univ., LLC*, No. 10-CV-940-IEG WVG, 2010 WL 3988684, at *7 (S.D. Cal. Oct. 12, 2010) (CLRA claim under § 1770(a)(10) was dismissed because the plaintiffs did not allege any lack of supply).

Another way of viewing this issue is through the "reasonable consumer" test. Even though the CLRA contains a list of enumerated deceptive acts, claims under the CLRA are governed by the "reasonable consumer" test. *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008). "Under the reasonable consumer standard, [plaintiffs] must show that 'members of the public are likely to be deceived.'" *Id.* (cleaned up). This requires the plaintiff to "plead facts showing that a 'significant portion of the general consuming public. . . , acting reasonably in the circumstances, could be misled.'" *Freeman v. Indochino Apparel, Inc.*, 443 F. Supp. 3d 1107, 1111 (N.D. Cal. 2020) (quoting *Lavie v. Procter & Gamble Co.*, 105 Cal. App. 4th 496, 508 (2003)).

Generally, determining "whether a reasonable consumer would be deceived" is a question of fact. *Cheslow v. Ghirardelli Chocolate Co.*, 445 F. Supp. 3d 8, 16 (N.D. Cal. 2020); *Reid v. Johnson & Johnson*, 780 F.3d 952, 958 (9th Cir. 2015). Nonetheless, in rare situations, "a court may determine, as a matter of law, that the alleged violations of the UCL . . . and CLRA are simply not plausible." *Cheslow*, 445 F. Supp. 3d at 16 (cleaned up); *Becerra v. Dr Pepper/Seven Up, Inc.*, No. 17-cv-05921-WHO, 2018 WL 1569697, at *7 (N.D. Cal. Mar. 30, 2018).

---

[35] Mot. – ECF No. 19 at 21–22.

[36] Compl. – ECF No. 1 at 4 (¶¶ 20–21).

Here, the plaintiff alleges that the defendants induced him to purchase ENG tokens "by representing that [the tokens] would contribute to the development and functionality of the Enigma Protocol and Catalyst" (which the plaintiff believed would in turn increase the tokens' value), but then "deliberately subvert[ing] [the plaintiff's] reasonable expectations by abandoning Enigma."[37] But again, at the time of the transaction, the plaintiff received everything he bargained for. The alleged abandonment came years later and "a CLRA claim cannot be based on events following a sales transaction." *Durkee v. Ford Motor Co.*, No. C 14-0617 PJH, 2014 WL 4352184, at *3 (N.D. Cal. Sept. 2, 2014).

### 2. Conversion

The defendants moved to dismiss the conversion claim on the grounds that they did not interfere with the plaintiff's ownership or possession of ENG tokens and their alleged acts were not wrongful because the plaintiff impliedly consented to them.[38] The plaintiff counters that the defendants' actions were inconsistent with his property rights in the tokens because the defendants destroyed his tokens or, viewed another way, the defendants' "abandonment" of the Enigma project was inconsistent with the plaintiff's property rights.[39] The court grants the motion.

"[C]onversion is the wrongful exercise of dominion over another's personal property in denial of or inconsistent with his rights in the property." *In re Emery*, 317 F.3d 1064, 1069 (9th Cir. 2003). "To establish a conversion, plaintiff must establish an actual interference with his ownership or right of possession" of the property in question. *Del E. Webb Corp. v. Structural Materials Co.*, 123 Cal. App. 3d 593, 610 (1981). The elements are: "(1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by wrongful act inconsistent with the property rights of the plaintiff; and (3) damages." *In re Emery*, 317 F.3d at 1069.

---

[37] *Id.* at 6–7 (¶¶ 46–48).

[38] Mot. – ECF No. 19 at 26–31.

[39] Opp'n – ECF No. 29 at 23–26.

With respect to the second element, although "[i]t is not necessary that there be a manual taking of the property," there must be "an assumption of control or ownership over the property." *Prakashpalan v. Engstrom, Lipscomb & Lack*, 223 Cal. App. 4th 1105, 1135 (2014) (cleaned up). Destroying property can, at least sometimes, satisfy this requirement. *Sanchez v. City of Fresno*, No. 1:12-cv-00428-LJO-SK, 2013 WL 2100560, at *14 (E.D. Cal. May 14, 2013) ("A cause of action for conversion can be based on either the taking of property or its intentional destruction or alteration.") (quoting 5 Witkin, Summary of Cal. Law, Torts §§ 710–11 (10th ed. 2005)). But the defendant's act must still have been "inconsistent with the property rights of the plaintiff." *In re Emery*, 317 F.3d at 1069.

At issue here is how the second element of conversion applies to intangible property rights, and specifically the property rights associated with securities. *Kremen v. Cohen*, 325 F.3d 1035, 1041 (9th Cir. 2003) (California courts have "long extended the tort [of conversion] to certain forms of intangible property such as stocks"); *Welco Elecs., Inc. v. Mora*, 223 Cal. App. 4th 202, 211 (2014) ("[T]he tort of conversion has been adapted to new property rights and modern commercial transactions."). This is even though a cryptocurrency might usually be treated as a commodity rather than a security. *Teed v. Chen*, No. 22-cv-02862-CRB, 2022 WL 16839496, at *11 (N.D. Cal. Nov. 9, 2022) ("Bitcoin is, and should be regulated as, a commodity.") (citing *Commodity Futures Trading Comm'n v. McDonnell*, 287 F. Supp. 3d 213, 224 (E.D.N.Y. 2018)). The SEC's order regarding ENG tokens shows why they qualify as a security: they "were offered and sold as investment contracts" under *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), and its progeny.[40]

The nature of an investment contract, then, helps define what property rights the plaintiff had by virtue of his ownership of ENG tokens. "The Ninth Circuit has distilled *Howey's* definition of an investment contract into a three-part test requiring (1) an investment of money (2) in a common enterprise (3) with an expectation of profits produced by the efforts of others." *Teed*, 2022 WL 16839496, at *11 (citing *Warfield v. Alaniz*, 569 F.3d 1015, 1020 (9th Cir. 2009)). A "common

---

[40] SEC Order, Ex. A to Patchen Decl. – ECF No 20-2 at 3.

enterprise" can exist where the investment scheme involves "horizontal commonality," which "may be established by showing that the fortunes of the investors are linked with those of the promoters." *Id.* at *12 (quoting *SEC v. R.G. Reynolds Enters.*, 952 F.2d 1125, 1130 (9th Cir. 1991)).

Cases illustrate what qualifies as an interference with intangible property rights for purposes of a conversion claim. In *Growth Props. v. Lempert*, 144 Cal. App. 3d 983, 987 (1983), for example, the court said the following about the plaintiff's collateral interest:

> As long as the substance of Growth's collateral [interest in a partnership] remained the same under Lempert's ownership [of the partnership], Lempert had not dealt with the collateral in a manner inconsistent with Growth's interest in the collateral. However, when Lempert conveyed [the partnership]'s only asset to his wife in 1974 without payment to the partnership, thereby rendering the partnership valueless, a conversion and an impairment of the security interest occurred.

In other words, Growth had an intangible property right in the form of a collateral interest in an independent asset (the asset held by the partnership), and when Lempert conveyed the independent asset and thereby rendered the collateral valueless, a conversion occurred. *Id.* Thus, where the substance of the intangible property has not changed there has been no conversion, because that substance (as opposed to the intangible property's value standing alone) is the property right. *Id.*; *see* Restatement (Second) of Torts § 242 (2023) ("One who effectively prevents the exercise of intangible rights . . . is subject to a liability similar to that for conversion[.]").

These principles help narrow the issue here. For one, the fact that the plaintiff still owns his ENG tokens is not dispositive: the question instead is whether the intangible property rights associated with his tokens have been interfered with. Also, the fact that the plaintiff's ENG tokens are now valueless is not dispositive: the plaintiff does not have a property right in the tokens' value standing alone. *BMA LLC v. HDR Glob. Trading Ltd.*, No. 20-cv-03345-WHO, 2021 WL 4061698, at *17 (N.D. Cal. Sept. 7, 2021) ("[T]here is no case law suggesting that a plaintiff can bring a conversion suit anytime a freely-undertaken, high-risk, high-reward investment turns out to be unsuccessful.") (cleaned up).

Furthermore, the scenario in *Growth Properties* might be analogized to the present case: like Growth, the plaintiff here held intangible property (an investment security) linked to the existence

of something independent of that property (Enigma's offerings). In the language of the *Howey* test for an investment contract, the plaintiff's fortunes were linked in a common enterprise with Enigma. Thus, because abandoning the Enigma project would constitute abandoning the common enterprise underlying the plaintiff's investment contract, there conceivably could have been a conversion here.

Yet as the defendants' argument shows, that is not the end of the analysis, because a conversion claim requires that the defendant's "act inconsistent with the property rights of the plaintiff" be "wrongful." *In re Emery*, 317 F.3d at 1069. The defendants contend that they did not engage in wrongful conduct: instead, they publicly disclosed the token-swap opportunity and what the plaintiff characterizes as their "abandonment" of the Enigma project. This gave the plaintiff the opportunity to swap his ENG tokens for Secret tokens. (In the language of the *Howey* test, the plaintiff had the opportunity swap his investment contract for one linked to a new (and roughly equivalent) common enterprise.) According to the defendants, the plaintiff's failure to take that opportunity constituted implied consent to the alleged conversion, which in turn means the conversion was not wrongful.[41] *Farrington v. A. Teichert & Son*, 59 Cal. App. 2d 468, 474 (1943) ("[T]here can be no conversion where an owner either expressly or impliedly assents to or ratifies the taking, use or disposition of his property.").

The defendants contend that *Farrington* shows that the plaintiff impliedly consented in the present case. In *Farrington*, the plaintiff's conversion claim "ar[ose] out of the removal of sand, rock and gravel from his land," and "[t]he court reasoned that the plaintiff had consented to the removal because he had simply watched as the defendant made multiple trips to the plaintiff's land, removing truckloads of sand, rock and gravel each time." *Bank of New York v. Fremont Gen. Corp.*, 523 F.3d 902, 914 (9th Cir. 2008) (describing *Farrington*).

The court's decision in *O'very v. Spectratek Techs., Inc.* is also relevant. No. CV03-0540CBMPJWX, 2003 WL 25781232 (C.D. Cal. Aug. 7, 2003). There, the plaintiffs alleged that after receiving shares of stock in Lumens in exchange for services they provided to Lumens, the

---

[41] Mot. – ECF No. 19 at 28–31.

defendants "transferred all assets of Lumens to Spectratek without any consideration to Lumens" and without any notice to the plaintiffs. *Id.* at *4. The plaintiffs thus alleged that "the stocks were wrongfully 'converted' to Spectratek." *Id.* The court held that the plaintiffs adequately alleged a claim for "wrongful conversion." *Id.*

These cases suggest that whether the defendants' alleged abandonment of the Enigma project in favor of the Secret Network project was a wrongful conversion could depend on whether the plaintiff had adequate notice of the opportunity to swap his ENG tokens for Secret tokens. At the pleading stage, of course, the court must draw all reasonable inferences in the plaintiff's favor and the question is only whether it is plausible that the defendants' conduct was wrongful.

The plaintiff emphasized at the hearing that he is not a US citizen (and thus isn't accustomed to SEC filings), the ENG tokens were not originally sold as securities (so he didn't have reason to watch for SEC filings or other announcements about the token swap), and he was not given direct notice of the token-swap opportunity.[42] On the other hand, the defendants cite *In re Dropbox Sec. Litig.* for the proposition that securities plaintiffs, at least, "are considered to have discovered a fact when a reasonably diligent plaintiff would have sufficient information about that fact to adequately plead it in a complaint." No. 19-CV-06348-BLF, 2020 WL 6161502, at *9, (N.D. Cal. Oct. 21, 2020) (cleaned up). Such a fact might be discovered in a SEC filing. *Id.* at *11. But even for securities plaintiffs, "[t]his is a fact intensive inquiry, and some courts have held it is usually not appropriate to conduct it at the pleading stage." *Id.* at *9 (cleaned up) (collecting cases in this district). Here, the token-swap opportunity was announced on Binance and Enigma's website in addition to SEC filings, and Binance is where the plaintiff bought his ENG tokens.

Under these circumstances, as the court said at the hearing, it is hard to conclude (even at the pleadings stage) that the defendants' conduct was wrongful. The relevant facts were disclosed in multiple ways, including public SEC filings, and at the direction of the SEC. Essentially, the plaintiff — an investor through a secondary market — wants direct notice. In the context of this

---

[42] Opp'n – ECF No. 29 at 25–26.

United States District Court
Northern District of California

case, that is not a plausible claim of conversion. The court thus grants the motion to dismiss the conversion claim.

## CONCLUSION

The court grants the defendant's motion to dismiss the CLRA claim: the plaintiff does not plausibly plead it, even considering the new CLRA theory advanced in his opposition. The court also grants the motion to dismiss the conversion claim. Practically, it seems hard to sue under the CLRA for what essentially is a claim for investor fraud for information publicly disclosed in SEC filings, on Enigma's website, and on Binance. The court appreciates that the plaintiff did not know about that opportunity, but consider the context. Enigma tried an ICO model designed to avoid securities rules, the SEC disagreed, and Enigma then complied with the SEC rules and disclosed all relevant information publicly, including the transition to Secret and the token swap. Put another way, this case seemingly is about only an investor's missed opportunity to swap his tokens, not fraud (or any other tort) affecting an investor. It also is not conversion.

The court nonetheless gives leave to amend in case the plaintiff has viable allegations. The plaintiff must file any amended complaint within twenty-one days and must attach as an exhibit a blackline of the amended complaint against the current complaint.

This resolves ECF No. 19.

**IT IS SO ORDERED.**

Dated: December 1, 2023

_____
LAUREL BEELER
United States Magistrate Judge